IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**IN THE MATTER OF THE SEARCH OF THE RESIDENCE/BUILDINGS, CURTILAGE, OUTBUILDINGS, AND VEHICLES LOCATED AT:**

617 MAPLE AVENUE, JOHNSTOWN, PA 15901 (the "SEARCH LOCATION")

Magistrate No. 3:24-100 MJ
**[UNDER SEAL]**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### I.      INTRODUCTION AND AGENT'S BACKGROUND

I, James A. Simpson, Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and say:

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed with the Federal Bureau of Investigations ("FBI") for the past sixteen (16) years.  I began my career in March 2008, when I underwent basic law enforcement training at the FBI Academy in Quantico, Virginia.  Upon graduation from the Academy, I was initially assigned to the FBI Newark Field Office, where I worked drug trafficking and computer intrusions until December 2014.  I then transferred to my current assignment at the FBI Laurel Highlands Resident Agency Pittsburgh Field Office.  In my current position, among other duties, I oversee the Southwest Pennsylvania Safe Streets Task Force ("SWPSSTF") and have been so assigned since December 2014.  The SWPSSTF is an intergovernmental law enforcement task force comprised of federal, state, and local enforcement officers who are specially deputized as federal Task Force Officers ("TFO") and authorized to conduct investigations into violations of

1

federal law.  The SWPSSTF's investigative focus consists of, but is not limited to, violations of

the federal Controlled Substances Act, 21 U.S.C. § 801, et seq., violent crime, and criminal gang

activity.

3.      In my capacity as a Special Agent with the FBI, I have been involved in more than

one hundred federal and/or state investigations and have personally arrested or directly assisted in

the arrests of drug law violators.  I have participated in numerous investigations involving the

unlawful distribution and possession with the intent to distribute controlled substances, including

heroin, fentanyl, crack cocaine, and methamphetamine, in violation of Title 21, United States

Code, Sections 841 and 846.  These investigations have utilized a variety of investigative

techniques including undercover officers, confidential sources, sources of information, physical

surveillance, electronic surveillance, pen registers, telephone toll analysis, and search warrants.  I

have personally served as the affiant on search warrants in drug investigations which have

discovered evidence and led to the successful prosecution of the targets.  Through my involvement

in these narcotics investigations, I have handled cooperating sources of information who were

involved in narcotics acquisition and/or trafficking.  Additionally, I have reviewed thousands of

communications between drug traffickers through review of cell phones seized pursuant to drug

investigations and content stored in cloud storage and/or social media accounts obtained pursuant

to search warrants and/or consent.  I have had hundreds of conversations with drug traffickers,

drug users, and other members of law enforcement regarding the methods and language used by

drug traffickers to smuggle, store, and distribute drugs and to collect and launder drug distribution

proceeds.

4.      Based on my training and experience, I am aware that it is common practice for

drug traffickers who desire to insulate themselves from detection by law enforcement to routinely

utilize multiple telephones, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and co-conspirators. Moreover, it is not unusual for drug traffickers to initiate or subscribe such phone services in fictitious names or under the name of an associate or family member to thwart detection by law enforcement. Also, it is now a common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features (but also other communication platforms such as Facebook, Instagram, Snapchat, WhatsApp, and others), nearly simultaneously, to communicate with their conspirators and customers. For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages. In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further his criminal activities.

5.      Further, based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transactions, attempt to conceal, disguise or legitimize unlawful proceeds through domestic and international banks and their attendant services, casinos, real estate, and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellular telephones to communicate with co-conspirators in furtherance of their money laundering activities.

6.      Additionally, as part of my experience, I have participated as the co-affiant, case agent, and monitor in five prior Title III wiretap investigations. Through this experience, as well

as by way of additional training, I am familiar with the technical aspects of wiretap investigations, including the call monitoring process, transcription of pertinent calls, minimization requirements, and physical surveillance component.  Through this experience, I am familiar with the coded language employed by drug traffickers to disguise the substance of their oral and textual communications.

7.      This Affidavit pertains to Che ROSE and Jessica WILSON, who are/have been involved in a conspiracy to distribute quantities of fentanyl, heroin, crack cocaine, and other controlled substances throughout the Western District of Pennsylvania, specifically in and around Johnstown, Cambria County, from at least April 2024 to June 2024, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.

8.      This Affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search for and seize evidence, instrumentalities, contraband, and fruits of violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.

## II.      EVIDENCE COMMONLY GENERATED BY DRUG TRAFFICKING

9.      Your Affiant is aware that in a substantial number of residential and vehicle searches executed in connection with drug investigations in which I and fellow drug agents/officers in the Western District of Pennsylvania have been involved, the following kinds of drug-related evidence typically have been recovered:

    a.  controlled substances, including methamphetamine, cocaine, crack cocaine, heroin and fentanyl;

    b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor

4

blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and vitamin B12;

c.  books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances or reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

d.  addresses, telephone books, and/or papers reflecting names, addresses, telephone numbers, fax numbers, and/or routing numbers of co-conspirators and customers;

e.  safes, money counting machinery, cash, currency, and records relating to controlled substances, income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, stocks, and bonds, as well as precious metals such as gold and silver, and precious gems such as diamonds – (this evidence often is located in a safe); as well as records relating to the sale, purchase and/or lease of automobiles, to include titles for all vehicles, and insurance records for all vehicles;

f.  documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts and telephone bills;

g.  photographs, including still photos, video tapes, films, and the contents therein, in particular photographs of co-conspirators and of assets;

h.  computers, hard drives, cellular telephones, and/or other electronic devices not considered telephones utilized for communication and data saving purposes, as well as documents relating thereto;

i.  firearms and other dangerous weapons; and

j.   identification evidence and/or indicia (such as cancelled mail, deeds, leases, rental agreements, photographs, bills, diaries, keys, and identification documents) which tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.

10.   Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug related paraphernalia, and drug related records (as described above) at or in their residences (including garages and outbuildings), businesses, and vehicles. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so to allow the drug trafficker to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Such listings are frequently kept inside their cell phones.

11.   It is also a generally common practice for drug traffickers to conceal at their residences and inside their vehicles, large sums of money; either the proceeds from drug sales or monies to be used to purchase controlled substances. In addition to cash, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.

12.   Evidence of such financial transactions and records relating to income and

expenditures of money and wealth in connection with drug trafficking would also typically be maintained in their residences.

13.     Often, drug traffickers possess firearms, ammunition, and other dangerous weapons in their residences, businesses, and automobiles to protect their profits, drug supply, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Typically drug traffickers maintain possession of the firearms for extended periods of time.

14.     Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances; furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc., are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses and automobiles.

15.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

16.     Persons involved in significant drug trafficking typically conceal in their

7

residences, businesses, and automobiles large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities. This type of evidence also often is located in a safe. I am aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

17.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to "legitimize" these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place expensive assets such as luxury vehicles in the names of other persons to conceal the true ownership and illegal source of the proceeds.

18.     Narcotics traffickers often take or cause to be taken photographs of them, their associates, their property, and their product. These traffickers usually maintain these photographs in their residences and/or vehicles. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity. This is because due to the illegal nature of their activities and the high risk of being "caught" by law enforcement, it is highly unusual for individuals primarily engaged in drug trafficking activities to associate regularly in their businesses or social activities with others not engaged in the same illegal drug trafficking activities.

19.     Drug traffickers often operate under assumed names in order to conceal their true

identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences, businesses, and automobiles, together with evidence of their true identities.

20.     Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and frequently by conducting their business during the nighttime hours when darkness helps to conceal their activities.  In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities.

21.     Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages.  It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.

22.     As with most electronic/digital technology items, communications made from an

9

electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Finally, it has become common for sophisticated drug traffickers to utilize computers, cellular telephones, and/or other electronic devices not considered telephones utilized for communication and data saving purposes, and evidence of their crimes often is found in the aforementioned electronic media.

23.    Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

24.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet

are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

25.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following:  (a) my own involvement in prior drug investigations and searches during the course of my law enforcement career, as previously described; (b) my involvement on numerous occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; (c) discussions with other members of FBI, HSI, and/or other federal, state and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and (d) other intelligence information provided through law enforcement channels.

26.     In addition, as a result of my conversations with Assistant United States Attorney Arnold P. Bernard, Jr. (WDPA), I am aware that the courts likewise have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside even if no drug trafficking was observed to occur there.  See, United States v. Whitner, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); and United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002) (in drug cases, evidence is likely to be found where drug dealers reside).

### III.   PROBABLE CAUSE

#### A.  Cooperating Source 1

27.     "Cooperating Source 1" or "CS 1" – Prior to his/her cooperation in this case, CS 1 served previously as a confidential informant with the SWPSSTF in 2023.   During his/her cooperation with the SWPSSTF, CS 1 provided information that was reliable and credible, and which has been corroborated by observations made by investigators conducting physical surveillance, consensual recordings, administrative subpoenas, and physical searches of subjects' residences.  CS 1's cooperation is responsible for dozens of controlled purchases from multiple drug traffickers.  These drug buys have led to multiple arrests and successful prosecutions with the SWPSSTF and the FBI.  CS 1's criminal history includes misdemeanor/summary convictions for larceny, disorderly conduct, retail theft, possession of drug paraphernalia, reckless endangerment.

28.     In April 2024, CS 1 met with federal TFOs and advised that he/she had recently observed a large quantity of crack cocaine at a residence associated with Che ROSE and Jessica WILSON on Steel Street in the Old Conemaugh Borough section of the City of Johnstown, Cambria County.  CS 1 later advised that since first reporting this address to TFOs, ROSE and WILSON moved in with WILSON's grandfather at 647 Plum Street in the Woodvale section of the City of Johnstown.

29.     According to CS 1, ROSE and WILSON are selling large quantities of crack cocaine to multiple individuals who come to the residence for drug purchases.  CS 1 stated that he/she could make purchases of crack cocaine from ROSE and/or WILSON.

30.     Your Affiant is aware that CS 1 cooperated/is cooperating with investigators in

exchange for monetary compensation.[1] Additionally, your Affiant is aware that CS 1, during a controlled buy, attempted to steal $80 in money provided to him/her to purchase narcotics. However, your Affiant submits that the information provided by CS 1, as detailed and relied upon for purposes of this affidavit, is credible and reliable based on the information gathered during the investigation and through its corroboration by law enforcement through interviews with other confidential sources, controlled buys, physical surveillance, and consensually recorded phone calls.

### B. Controlled Drug Buys

31.     Since April 2024, federal agents/TFOs have completed six (6) controlled buys from ROSE and WILSON.

32.     A "controlled buy" is a purchase of a controlled substance by a CS under the direct control and supervision of a police investigator.  Officers search the CS and his/her vehicle (if it is to be utilized) for drugs and currency prior to the transaction.  TFOs follow the CS to and from the point of purchase and attempt to always maintain visual contact, except when the CS enters any structure where the purchase is to take place.  After the purchase, investigators follow the CS back to a predetermined location where the CS relinquishes the drugs to the officers and the CS, and any vehicle utilized by the CS, is again searched.  When practicable and lawful, the CS is equipped with recording equipment to attempt to capture an audio/video recording of the deal. Law enforcement followed these procedures during each of the controlled purchases described herein.

---

1       To date, CS 1 has received $14,350 in cash payments in exchange for CS 1's cooperation in this investigation and has received payments previously for information relating to other state investigations.

33.     The chart below sets forth the dates of these controlled buys, the weight[2] (in grams) of the substance purchased[3], and the subjects involved in arranging and/or completing the transaction.

| No. | Date | Weight | Substance | Subject(s) Involved |
|---|---|---|---|---|
| 1 | 4/25/2024 | 3.16* | Crack Cocaine | Che Rose and Jessica Wilson |
| 2 | 4/30/2024 | 3.06* | Crack Cocaine | Che Rose and Jessica Wilson |
| 3 | 5/2/2024 | 3.8* | Crack Cocaine | Che Rose and Jessica Wilson |
| 4 | 5/9/2024 | 3.6* | Crack Cocaine | Che Rose and Jessica Wilson |
| | | 1* | Heroin/Fentanyl | |
| 5 | 5/15/2024 | 3.0* | Crack Cocaine | Jessica Wilson |
| | | 1* | Heroin/Fentanyl | |
| 6 | 5/20/2024 | 1* | Heroin/Fentanyl | Che Rose and Jessica Wilson |

### C.  Arrest of Che ROSE and Jessica WILSON

34.     Based on the series of controlled buys conducted from ROSE and WILSON, a federal criminal complaint was filed against ROSE and WILSON which charges them as follows: from on or about April 25, 2024 through on or about May 20, 2024, in the Western District of Pennsylvania, Che ROSE and Jessica WILSON committed the offense of conspiracy to distribute and to possess with intent to distribute quantities of mixtures and substances containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl, cocaine, and cocaine base (in the form commonly known as "crack"), Schedule II controlled substances, contrary to the provisions of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), in violation of 21 U.S.C. § 846.  That criminal complaint was issued on June 4, 2024 and is docketed at magistrate number 3:24-MJ-96

---

2       A "*" was placed in the controlled buy chart to identify controlled buys that are awaiting lab results.

3       The weights and substances listed are approximated weights based on the officers' digital scale.  Similarly, the substance listed for controlled buys 1-6 are *suspected* substances based on the officers' training, experience, and knowledge of the investigation.  Laboratory testing of these substances is pending.

(Under Seal).

35.     In connection with the criminal complaint, federal arrest warrants for ROSE and WILSON were issued.

36.     On June 4, 2024, investigators monitoring cell site location information associated with phones used by ROSE/WILSON tracked the devices to South Fork, Pennsylvania and TFOs established surveillance in the area near 511 Grant Street.   At approximately 11:55 a.m., investigators observed ROSE and WILSON, accompanied by a female (later identified as Mattison Moore) and a male (later identified as Richard Cauffield), exit the residence at 511 Grant Street.

37.     At that point, investigators arrested ROSE and WILSON pursuant to the federal arrest warrants.  During a search incident to arrest, investigators found WILSON in possession of $254 cash, two knotted baggies containing suspected crack cocaine, and an unmarked prescription bottle with a variety of unknown pills.  During a search of ROSE incident to arrest, investigators found ROSE in possession of approximately 17 grams of crack cocaine (hidden in his crotch) and approximately $2,311.

38.     Investigators applied for and obtained a warrant to search the residence at 511 Grant Street.  However, no additional drugs were found therein.  ROSE and WILSON were lodged at the Cambria County Prison.

### D.  Recorded Jail Call Involving Jessica WILSON

39.     On June 7, 2024, at approximately 3:30 p.m., investigators received information that WILSON had contacted an individual via the Cambria County Prison telephone system and directed the individual to obtain quantities of drugs and money from her (WILSON's) uncle's residence.

40.     Investigators queried the Cambria County Prison telephone system and found a call

involving WILSON made from the prison phone account of Sabrina Michalides.  Investigators reviewed the call and found that WILSON, from Michalides's account, first called Jesse Lantzy via telephone number ending in 7797.  Lantzy then three-way called Mattison Moore several times at WILSON's direction.  Investigators recognized the voices of WILSON and Moore from previous, recent encounters with the two.  At approximately 10 minutes and 30 seconds into the call, WILSON can be heard directing Moore to go to her (WILSON's) uncle's house and pick up "nine of them" and "a whole bunch of the other".  Later in the call WILSON emphasized again to Moore that at the residence there are "nine of what you like and whole ones".  Based on your affiant's training, experience, and knowledge of the investigation, I believe that, during this call, WILSON directed Moore to retrieve nine ounces of crack cocaine and a quantity of heroin/fentanyl ("nine of what you like and whole ones").  Also, during the call, WILSON advised Moore that there is "probably like 5,000 [dollars]" at her uncle's residence and WILSON told Moore to pick up the money and deposit some on her prison commissary account before the end of the day.

41.    Investigators know WILSON's "uncle" to be Mark Corson.  Investigators also know that Corson's residence is located at 617 Maple Avenue, Johnstown, PA based on a prior investigation involving WILSON that resulted in her indictment (U.S. v. Mikal Davis, et al., 3:21-cr-16).  Furthermore, during the encounter with Moore/Cauffield on June 4, 2024, the two explained to officers that they had picked up ROSE/WILSON at 617 Maple Avenue early that morning and brought them to 511 Grant Street, South Fork.  While conducting surveillance on June 7, 2024, in anticipation of this search warrant application, investigators observed Mark Corson arrive at and enter the SEARCH LOCATION at approximately 4:23 p.m.

IV.    CONCLUSION

42.    Based upon training, experience, and knowledge of all of the facts of this

investigation, your Affiant submits that there is probable cause to conclude that evidence of violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, more particularly described in Attachment B, is presently located at 617 Maple Avenue, Johnstown, PA 15901.

The above information is true and correct to the best of my knowledge, information and belief.

/s/ *James A. Simpson*
James A. Simpson
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
This 7th day of June 2024.

HONORABLE KEITH A. PESTO
United States Magistrate Judge